UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  <br>  )  <br> v.  )  <br>  )    Crim. No. 07-3-B-W <br> BLAKE D. HAMPE,  )  <br>  )  <br>     Defendant.  ) | |

**RECOMMENDED DECISION ON MOTION TO SUPRESS**

The Grand Jury has indicted Blake D. Hampe on charges of knowingly possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2256(8)(A). Hampe has moved to suppress computer files and certain statements that the Government would offer against him at trial. On April 9, 2007, I held an evidentiary hearing and I now offer the following proposed findings of fact and a recommendation on the pending motion. Based on my findings I recommend that the Court grant the motion as to some, but not all, of the challenged statements and otherwise deny the motion.

**Proposed Findings of Fact**

The Bar Harbor ferry terminal is a non-staffed, seasonal port of entry (POE). The POE exists so that customs and immigration officials can perform checks of vehicles and pedestrians entering the United States from Nova Scotia on the ferry, which runs from May through October. During this season the customs and border protection officers ("CBP officers") who come to the Bar Harbor POE also have duties relating to cruise ships and private yachts that may call at the port from all over the world. When vehicles disembark from the ferry they cue up in five parallel lanes, each of which is ordinarily staffed by an officer who conducts the primary inspection of all vehicles in his lane. Pedestrians disembarking from the ferry are directed to a

terminal located on the dock.  The back half of the terminal building is set up to inspect pedestrians entering from the ferry in numbers anywhere between 30 and 300.  The remainder of the terminal contains general office space and a more private area known as the "search room," where more intrusive secondary searches may take place.

When individuals first disembark the ferry, whether on foot or in a vehicle, their initial contact with the customs agent is for the purpose of primary inspection.  The purpose of the primary inspection is to screen individuals to determine their citizenship and to inquire as to any articles that they may be bringing into the United States, including fruits, meats and other goods purchased abroad.  Approximately two percent of the travelers disembarking the ferry are referred to what is known as secondary inspection.  They may be referred for any reason, such as to follow up on immigration processing or because an officer conducting a primary inspection feels that there is some other reason why a more thorough follow-up inspection should take place.  When individuals disembarking by vehicle are referred for secondary inspection, they are instructed to pull out of the lane, park their vehicle and enter the terminal.

At approximately 7:30 p.m. on September 26, 2006, Hampe disembarked the CAT ferry and drove his vehicle to the Bar Harbor POE.  He encountered CBP Officer Herb Spencer at the primary inspection point.  Spencer believed that Hampe answered his routine questions in a nervous and evasive manner.  Spencer also observed that Hampe's vehicle was fully loaded with possessions.  Due to these collective circumstances and also due to the fact that Hampe reported coming from a Rolling Stones concert in Canada, Spencer thought there might be narcotics in the car.  Spencer also thought it was passing strange that Hampe's vehicle contained children's toys and small sleeping bags although Hampe denied traveling with any children.  Spencer referred Hampe to secondary inspection.

Spencer continued with his primary inspection duties for another 10 to 15 minutes, during which time Hampe waited in the general waiting room inside the building. Once Spencer finished with the vehicular traffic he went inside the building and spoke again with Hampe, who reiterated the earlier details of his declaration in response to Spencer's routine questions. Spencer then worked with another officer to methodically search Hampe's vehicle. Among the first things Spencer discovered was what appeared to be a marijuana roach on the floor of the vehicle. Spencer used a testing kit available to the customs officers to conduct a field test and the roach tested positive for marijuana.

On September 26, 2006, John Hartley was the supervising officer at the Bar Harbor POE. Once Spencer received the positive result from the marijuana test he sought Hartley's permission to conduct a personal search of Hampe. Prior to the discovery of the roach Hartley had not been directly involved in Hampe's inspection. Hartley authorized a pat down search of Hampe's person. Ryan Smith, another CBP officer, conducted the pat down search of Hampe's person. The search took place in a more private search room situated off the lobby of the terminal. No additionally narcotic substances were found and ultimately the marijuana possession resulted in a $300.00 administrative penalty, which Hampe paid later that evening.

While the personal search was underway, Officers Spencer and Garcia, perhaps assisted by Officer Ruddnick, continued to search the vehicle. They found a lot of merchandise for children. In addition to the sleeping bags, there were children's stickers, children's underwear, children's towels or blankets with super heroes printed on them and packages of trading cards. The officers also found 12-15 condoms, a container of personal lubricant, a camera, a cell phone and an Apple laptop computer. Spencer reported the additional findings to Hartley and indicated that he and the other officers had by now developed a suspicion that there might be child

3

pornography on the computer or camera. Hartley agreed that a reasonable suspicion existed and he authorized an officer to check the computer for pornographic images.

Michael Hutchins, a Brewer high school math teach and part-time customs officer, was the only officer on duty who was familiar with the Apple/Macintosh operating system and so Hartley instructed him to turn the computer on and check for pictures. Hutchins did not engage in any kind of sophisticated search but he did click open a couple of the icons he observed on the desktop. At first he found photographs of nude adults and a number of additional jpeg files containing photographs. Eventually Hutchins also located some pictures of what he considered to be child pornography. He showed these pictures to Hartley who shared the impression that the pornographic pictures depicted children. Hartley ordered Hutchins to stop searching and to turn off the computer in order to prevent the evidence from being compromised in any way. Following customary procedure, Hartley then called Immigration and Customs Enforcement ("ICE") in Bangor to receive instructions as to how to proceed.

It was 7:50 p.m. when then roach was found in Hampe's vehicle and 8:30 p.m. when Hartley contacted Special Agent Cogan to notify him as to what was found on the computer. During this 40 minute window of time, Hampe remained in the small room adjacent to the waiting room where he had been taken to perform the pat down search. After Cogan was first contacted there was some uncertainty about whether Hampe would be detained or released. Cogan notified Hartley initially that at a minimum the computer would be seized, but both Hartley and Cogan had to call their supervisors before a final decision was made about Hampe's continued detention. After the pat down Officers Smith and Garcia remained with Hampe in the small secondary room. At all times the door to the larger waiting area remained open. Garcia and Smith questioned Hampe within this 40 minute window prior to the initial contact with ICE.

At first the conversation was redundant of the preliminary questioning, going over where Hampe was coming from and what he had been doing in Canada. The officers did not discuss the computer with Hampe because they did not know about that development at this time. In the course of their questioning they were informed by Hampe that he worked teaching guitar to autistic children. Eventually Smith went to the main office to see what had developed from the vehicle search. He learned (as did Garcia) about the children's toys and sleepwear and that a computer had been found. Smith then talked some more with Hampe about the children's toys and Hampe's work with autistic children. Smith left the room a second time and at that point Spencer told him about the child pornography found on the computer. Smith went back into the room and asked Hampe if there was anything else in the car they should know about that he wanted to declare. Hampe denied that there was anything else. As Smith started to walk out of the room Hampe called him back and told him there were some incriminating pictures of children and himself on the computer. He said that he suspected Smith already knew about the photos, as was indeed the case. According to Hartley and Smith, at this point a final decision still had not been made about whether Hampe would be released or whether the investigators from Bangor would come to Bar Harbor and take him into custody.

Sometime after Hampe's initial incriminating statement, Smith informed Hampe of the possibility that he might be released but that his computer would be seized. In a discussion that followed Hampe made statements to the effect that he had been kicked out of his uncle's house on account of a discovery of child pornography, that he had also stored child pornography on his mother's home computer, and that he had received counseling for his "problem."

On one or more occasions between 7:50 p.m. and 8:30, Hampe requested to call an attorney. Although Smith denied hearing that request,[1] Hampe testified that he asked to call his family attorney on three separate occasions and Officer Hartley testified that he understood Hampe wanted to call an attorney. Hartley observed that the request was denied because it occurred during the time of the routine secondary inspection. Hartley testified that, as a matter of policy, a person is not allowed to call an attorney during a routine primary or secondary inspection. I conclude from this evidence that Hampe's request for his attorney was likely made to Garcia and that Garcia relayed the request to Hartley during the secondary inspection process.

At 9:00 p.m., the customs officers began taking a "detention log" to record their observations and comments concerning Hampe's ongoing detention. (Gov't Ex. 6.) At 10:55 p.m. ICE agent Cogan informed Hartley that he was coming to Bar Harbor to take custody of Hampe. Upon receipt of this communication, Hartley concluded that it was now a Miranda situation and he ordered that no more questioning of Hampe was to take place.

At approximately 2:30 a.m., ICE agents placed handcuffs on Hampe and, shortly thereafter, assumed custody. This was the first time that Hampe was placed in handcuffs on the night in question. During his detention at the Bar harbor POE terminal Hampe was never free to leave or left alone, but he was allowed to go to the bathroom and smoke cigarettes. During the period of time up until Smith was informed of the pornographic pictures on the computer, the situation could fairly be described as a routine secondary inspection. After the pictures were found and ICE was alerted, Smith continued to question Hampe because he believed Agent Cogan's decision was to seize the computer and release Hampe. The final portion of the conversation with Hampe, in which Hampe spoke to Smith of his uncle's computer, his mother's computer and his counseling, lasted for about twenty minutes. Smith testified at trial that he

---

[1] Garcia was not present at the hearing.

6

obtained this information during questioning he engaged in despite "knowing" the Hampe had committed a "serious crime" involving child pornography.

## Discussion

Hampe argues that statements he made to the CBP officers should be suppressed because he was subjected to custodial interrogation after being formally arrested without having received his Miranda warnings. (Mot. to Suppress at 2-3, Docket No. 25.) In his view, formal arrest arose at the latest following the discovery of what appeared to be child pornography on his computer. (Id. at 3.) Hampe also argues that files taken from his computer must be suppressed as well because the CBP officers lacked sufficient cause to search his computer. (Id. at 4.) He relies on a decision out of the Central District of California for the proposition that a search of a traveler's computer files is a "non-routing, invasive search[] that implicate[s] personal privacy and dignity" and therefore requires reasonable suspicion, even at the border. (Id., quoting United States v. Arnold, 454 F. Supp. 2d 999, 1003 (C.D. Cal. 2006).) I address the computer search first because the results of that search inform the question of whether and when Hampe's detention was transformed from routine secondary inspection into formal arrest.

A.   *The search of Hampe's computer was a permissible border search.*

The Government argues that reasonable suspicion is not required to justify a search of a personal computer carried across the border. (Gov't Opp'n Mem. at 6-7.) It cites Supreme Court precedent that holds that border searches of persons and their effects are reasonable even in the absence of suspicion. (Id. at 7, citing, *inter alia*, United States v. Flores-Montano, 541 U.S. 149, 152 (2004); United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).) The Government recognizes that the Court of Appeals for the First Circuit has indicated that reasonable suspicion may be required for certain border searches, but argues that such searches

7

are limited to those involving the dignity of the person, such as strip searches and cavity searches.  (Id. at 8, citing United States v. Braks, 842 F.2d 509, 511-13 (1st Cir. 1988).)  The Government's briefing is thorough and accurate and I agree that the search conducted by Officer Hutchins in this case, which involved a computer search limited to opening and perusing files with icons located on the desktop, did not implicate any of the serious concerns[2] that would justify characterizing this particular search as "non-routine."  Moreover, even if the Court were to entertain the proposition that reasonable suspicion is required to search a computer at the border, the peculiar facts presented to the officers in this case gave rise to a reasonable suspicion that Hampe's computer might contain child pornography.  In particular, the presence of children's sleeping bags and superhero-themed underwear, when there was no child traveling in the vehicle, coupled with the presence of condoms, personal lubricant, a camera and computer, permits some extremely troubling inferences to be drawn.  Although it may be the case that the children's merchandise and the personal merchandise were unrelated in that the former were related to Hampe's work and the latter to his trip to see the Rolling Stones concert, the hypothetical reasonable officer would more likely than not be troubled by the disturbing coupling of these particular items in a car operated by a solitary male traveler.  Based on the officers' testimony, I find that they were in fact suspicious of child pornography under these circumstances, that their suspicions were reasonably held and that their suspicions were more than adequate to justify the limited search of Hampe's personal computer at the border.

---

[2]   The factors are:  (1) whether the search required the suspect to disrobe or expose any intimate body parts; (2) whether physical contact was made with the suspect during the search; (3) whether force was used; (4) whether the type of search exposed the suspect to pain or danger; (5) the overall manner in which the search was conducted; and (6) whether the suspect's reasonable expectations of privacy, if any, were abrogated by the search.  Braks, 842 F.2d at 512.

8

B.   *Unwarned questioning of Hampe should have ceased after the CBP officers had probable cause to believe that Hampe's computer contained child pornography and referred the matter to ICE for further processing.*

Hampe maintains that all of his statements should be suppressed because he was subjected to custodial interrogation without the benefit of a Miranda warning.  (Mot. to Suppress at 2-3.)  The Government responds that the circumstances of Hampe's detention never rose to the level of a formal arrest until ICE assumed custody of Hampe some seven hours after he arrived at the Bar Harbor POE.  (Gov't Opp'n Mem. at 4.)  I conclude that formal arrest attached once the CBP officers had probable cause to believe they had found child pornography on Hampe's computer *and* had referred the matter to ICE for further processing.  If the Court should agree with this finding then Hampe's statements concerning his uncle, his mother, their computers and his "problem" should be suppressed because they were obtained by means of unwarned custodial interrogation or the equivalent of interrogation.

The Miranda rule requires that warnings be administered to criminal suspects preceding "custodial interrogation" in order to safeguard the Fifth Amendment privilege against self-incrimination.  United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004).  "The protections of Miranda extend beyond actual questioning by the police to include the 'functional equivalent' of interrogation, meaning 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  For Hampe's motion to succeed, it must be apparent that he was in custody at the time of his unwarned statements and that the statements were made in response to words or actions reasonably likely to elicit an incriminating response.  Statements made "freely and voluntarily without any compelling influences" are admissible in evidence, even if they are made while the

9

suspect is subject to formal arrest. Miranda v. Arizona, 384 U.S. 436, 478 (1965). For purposes of the Fifth Amendment, "in custody" means that the defendant has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest. United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Id. at 711. "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quotation marks and citation omitted).

The Government argues that Hampe was not entitled to the full level of protection afforded by Miranda because he was being questioned at the border. (Gov't Opp'n Mem. at 4-5.) The Court of Appeals for the First Circuit has held that "secondary inspection is not innately custodial" even if travelers are kept in the company of armed officers and are not free to leave for over an hour. United States v. Fernandez-Ventura, 132 F.3d 844, 847 (1st Cir. 1998). Per Fernandez-Ventura, "routine" customs inspection, including secondary inspection, is not equivalent to custody for purposes of the Miranda rule. Id. at 848 ("We conclude that the factors cited by the district court do not distinguish this case from a routine Customs inspection so as to support the court's conclusion that [the defendants] were in custody.").

The question is whether the circumstances of Hampe's detention became non-routine at some point prior to the arrival of ICE so as to equate with formal arrest rather than routine border processing. Hampe made all of his incriminating statements concerning the presence of child pornography on his computer shortly after its discovery by the CBP officers. I would place all of

10

these statements as having been made sometime between 8:30 and 9:30 p.m. Hampe's initial statement that incriminating pictures could be found on his computer was likely made within a half hour of its discovery at 8:30 by Officer Hutchins. Officer Smith testified that he left Hampe with Garcia and learned from Spencer about the discovery of child pornography. After speaking with Spencer, Smith returned and asked whether Hampe had anything else to declare. Hampe demurred, but eventually stated that his computer had incriminating pictures on it. Meanwhile, Officer Hartley was attempting to reach ICE and his own superior officers about the matter. Based on these events, I would place the initial incriminating statement in the 8:30 to 9:00 timeframe, which makes the timing essentially the same as the timing at issue in the Fernandez-Ventura opinion. Moreover, based on my impression of the evidence presented at the hearing, Officer Smith obtained the incriminating statement at a time when he was still engaged in a routine secondary inspection. Although he understood that incriminating evidence had been found, the CBP officers were still trying to determine the consequences of that fact and Officer Smith merely asked Hampe the routine question about whether there was anything else he would like to declare. I conclude that Hampe was not yet "in custody" for purposes of the Miranda rule, but still within the parameters of routine secondary inspection.

    The subsequent incriminating statements about Hampe's uncle, mother and "problem" were made after another spell of time had passed, at least enough for Officer Hartley to discuss the matter with ICE Agent Cogan and to determine that they would seize the computer for ICE and continue to detain Hampe until ICE made a further decision about whether to come down and take custody of Hampe as well. In conjunction with these events, Hartley decided that it was now appropriate for the officers to start a formal detention log, which has some tendency to suggest that the continuing detention of Hampe was changing into something other than a

"routine" inspection. At some point roughly in line with these further developments, Officer Smith returned to the room where Hampe was being detained, told him that they might only seize his computer and let him go, and then spent approximately 20 more minutes questioning him about the presence of child pornography on the computer. This conversation likely occurred between 9:00 and 9:30, though it may have commenced shortly before 9:00. The detention log reflects that Officer Smith was with Hampe in that timeframe and that Hampe spent some time vomiting in the bathroom shortly after their exchange.

Although the overall duration of Hampe's detention at the time of the later incriminating statements (roughly two hours) was still not so considerable as to weigh in favor of a finding of formal arrest, I am persuaded that the overall circumstances had transformed his detention from a routine secondary inspection to a conventional custodial arrest designed to serve criminal enforcement objectives that were no longer related to routine border processing. When the purposes and practices of a "routine" border inspection have been served and discretion over the further processing of a suspect is referred to another law enforcement agency based on probable cause, the Court, in my view, should no longer suspend its disbelief that the defendant was "in custody" for purposes of the Fifth Amendment and the Miranda rule. With the referral of charging discretion to ICE, including all discretion over whether the seizure of Hampe's person would continue, and the commencement of a formal detention log, Hampe was effectively and formally arrested and no longer a mere traveler required to endure detention for purposes of routine inspection at the border. The CBP officers should have ceased all unwarned questioning at that time. Instead, Officer Smith subjected Hampe to approximately twenty minutes of further questioning after informing him that they might let him go and seize only his computer. That questioning elicited incriminating statements about Hampe's relationship with certain family

members, other computers not present at the border, and Hampe's self-professed "problem"; statements having nothing to do with the routine matter of what Hampe had to declare in relation to his arrival at the border. Under these circumstances I cannot avoid finding that these later statements were the product of interrogation or its functional equivalent. Officer Smith conceded that the statements were obtained as a result of continued questioning and the Government has not argued that these particular statements were offered voluntarily. Because the statements were the product of custodial interrogation and were not preceded by the Miranda warnings, the statements are subject to the exclusionary remedy, for "it is a constitutional rule that a confession resulting from custodial interrogation not preceded by appropriate warnings is normally inadmissible against the speaker." United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (citing Dickerson v. United States, 530 U.S. 428, 431-32, 444 (2000).).

## Conclusion

For the reasons stated above, I RECOMMEND that the Court GRANT, IN PART, the defendant's motion to suppress and exclude from introduction in evidence the defendant's incriminating statements relating to his uncle, his mother, the presence of child pornography on their computers, and the defendant's "problem." I RECOMMEND that the Court DENY the motion, IN PART, insofar as it asks for the suppression of the files discovered pursuant to the search of his computer at the border and for suppression of Hampe's initial incriminating statement that his computer contained incriminating pictures of himself and children.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy

thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated April 18, 2007